**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-4683 and 14-1007
_____

BUDDY'S PLANT PLUS CORPORATION,
                                          Appellant/Cross-Appellee

v.

CENTIMARK CORPORATION,
                                          Appellee/Cross-Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-10-cv-00670)
Magistrate Judge: Honorable A. Robert C. Mitchell (by consent)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 8, 2014

BEFORE: VANASKIE, COWEN AND VAN ANTWERPEN,  Circuit Judges

(Filed: March 6, 2015)
_____

OPINION*
_____


COWEN, Circuit Judge.

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

In this diversity case, a jury returned a $1.8 million verdict in favor of Plaintiff Buddy's Plant Plus Corporation ("Buddy's") and against Defendant CentiMark Corporation ("CentiMark") on Buddy's breach of contract and warranty claims. Although the Magistrate Judge ultimately upheld the verdict in its favor, Buddy's appeals from the Magistrate Judge's order granting summary judgment in favor of CentiMark with respect to Buddy's claim of fraudulent inducement. CentiMark filed a cross-appeal of its own. We will affirm.

## I.

This action arose out of CentiMark's installation of an allegedly defective roof coating system—specifically an elastometric acrylic coating—on buildings occupied by Buddy's. In particular, the buildings were damaged in a hail storm, causing leaks. Buddy's hired CentiMark to apply the coating. Although the coating was installed, Buddy's reported that the leaks continued. CentiMark unsuccessfully attempted to fix the leaks. In the process, it installed ungasketed fasteners into the metal roof panels.[1] Buddy's eventually filed suit against CentiMark.

The parties consented to have a Magistrate Judge conduct all proceedings in this case. CentiMark filed a motion for summary judgment. On January 16, 2013, the Magistrate Judge granted this motion as to Buddy's claims for breach of express warranties, breach of implied warranties, breach of the implied warranty of

---

[1] A "gasketed" fastener is a screw with a rubber washer, which creates a watertight "gasket" around the screw hole when the screw is tightened. An "ungasketed" fastener lacks this rubber washer.

merchantability, and fraudulent misrepresentation. However, the claims for breach of contract and breach of the warranty to perform in a workmanlike manner were allowed to go forward. The Magistrate Judge also determined that two contractual provisions were enforceable against Buddy's: (1) a provision requiring Buddy's to commence any action against CentiMark within one year from the date that a defect or other breach or claim is discovered or reasonably should have been discovered; and (2) a provision stating that CentiMark shall not be liable for any special, incidental, or consequential damages. According to the Magistrate Judge, CentiMark would be entitled to judgment as a matter of law on its remaining claims if a jury finds that it was reasonable for Buddy's to discover the breach before November 3, 2008 (i.e., one year prior to the commencement of this case). On October 18, 2013, the Magistrate Judge disposed of the parties' motions in limine, specifically denying CentiMark's requests to exclude the expert testimony and report of Kirby Hartman regarding the estimated cost of replacing the roof panels as well as to exclude photographs and videos of the roof. The parties were also prohibited from offering any evidence as to conversations that took place before the contract's execution to explain the meaning of the term "waterproofing material" used in the construction specification.

A jury trial was then held on the two remaining breach of contract and warranty causes of action. CentiMark moved for judgment as a matter of law at the close of Buddy's case in chief and after it completed its own defense. On December 2, 2013, the Magistrate Judge denied both motions. He also rejected CentiMark's proposed

instruction regarding Buddy's affirmative duty to investigate the cause of its injury for purposes of the contractual one-year limitations period.

The jury returned a verdict in favor of Buddy's and against CentiMark on December 2, 2013. The jury specifically answered "NO" to the first two questions put to it: (1) "Did Buddy's know or should it have known in the exercise of 'reasonable diligence,' as that term has been defined to you, that before November 3, 2008, CentiMark materially failed to perform one or more of its duties under the contract;" and (2) Did Buddy's know or should have known in the exercise of 'reasonable diligence,' as that term has been defined to you, that before November 3, 2008, the continued leaking at its buildings was the result of CentiMark's defective material or workmanship." (A1663.) The jury found that Buddy's proved by a preponderance of the evidence that: (3) "CentiMark materially failed to perform one or more of its duties under the contract which consists of the Construction Specification, the Sales Agreement, and the Non-Prorated Limited Roof Warranty;" (4) "CentiMark's material failure to perform one or more of its duties under the contract caused Buddy's to sustain damages;" (5) "the materials and/or workmanship provided by CentiMark were defective;" (6) "the defective materials and/or workmanship supplied by CentiMark were the direct and proximate cause of the roof leaks;" and (7) "CentiMark failed to repair the leaks that were proximately caused by defects in CentiMark's materials and/or workmanship." (A1664-65.) The jury awarded Buddy's damages in the amount of $1.8 million.

CentiMark moved to mold the verdict to an amount not exceeding the contract

4

price (i.e., approximately $550,000). On December 3, 2013, the Magistrate Judge denied its motion and entered judgment in favor of Buddy's and against CentiMark in the amount of $1.8 million. CentiMark renewed its prior motions for judgment as a matter of law. It also filed a motion for a new trial as well as a motion for reconsideration of the order denying its motion to mold the verdict. On March 31, 2014, the Magistrate Judge denied CentiMark's post-trial motions.

## II.

While Buddy's merely challenges the Magistrate Judge's disposition of the fraudulent inducement claim, CentiMark raises at least six issues in its cross-appeal.[2] In the end, we determine that the Magistrate Judge did not commit a reversible error.

Buddy's alleged that "CentiMark made fraudulent representations regarding the waterproofing abilities of the elastometric acrylic coating and, in doing so, induced Buddy's to enter into the contract." Buddy's Plant Plus Corp. v. CentiMark Corp., Civil Action No. 10-670, 2013 WL 169697, at *6 (W.D. Pa. Jan. 16, 2013). It is uncontested that the parties executed an integrated written contract. For instance, the sales agreement stated that "[t]he performance of the work contemplated by this Sales Agreement shall be governed solely by the terms and conditions stated herein" (A3383), and the warranty likewise provided that it "is understood to be the complete and exclusive warranty agreement between the Purchaser and CentiMark, superseding all prior agreements,

---

[2] The Magistrate Judge possessed subject matter jurisdiction over this diversity matter pursuant to 28 U.S.C. § 1332. We have appellate jurisdiction under 28 U.S.C. § 1291. It appears undisputed that Pennsylvania substantive law applies to this matter.

5

whether oral or written, and all other communications between the parties relating to the subject matter of this Warranty" (A3386). "'Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.'" Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004) (quoting Gianni v. Russell & Co., 126 A. 791, 792 (Pa. 1924)). Accordingly, "parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.,* that an opposing party made false representations that induced the complaining party to agree to the contract" (although such evidence may be introduced based on a claim of fraud in the execution the contract, i.e., that a term was fraudulently omitted from the contract). Id. at 437 n.26 (citing HCB Contractors v. Liberty Place Hotel Assocs., 652 A.2d 1278, 1279 (Pa. 1995); Bardwell v. Willis Co., 100 A.2d 102, 104 (Pa. 1953)).

According to Buddy's, its fraudulent inducement cause of action was not barred by the integration clause and the parol evidence rule because the prior misrepresentations were actually contained in the written contract. While the Magistrate Judge indicated in his summary judgment ruling that Buddy's should have insisted that the alleged waterproofing representations be set forth in the integrated written agreement, he subsequently concluded in the in limine opinion that the term "waterproofing material" included in the construction specification (which became part of the parties' contract) unambiguously referred to a water-tight barrier. However, these rulings addressed two distinct questions. As the Magistrate Judge explained, "[t]he court granted summary

6

judgment in favor of CentiMark on the basis of the parol evidence rule as it applied in the context of a fraudulent inducement claim." Buddy's Plant Plus Corp. v. CentiMark Corp., 978 F. Supp. 2d 523, 536 (W.D. Pa. 2013) (citing Buddy's, 2013 WL 169697, at *6). "This reasoning does not apply in the current context because the parties now argue whether parol evidence is admissible to define the contract's terms." Id. In fact, the Magistrate Judge ultimately applied the parol evidence rule in both instances, i.e., it granted summary judgment in favor of CentiMark as to Buddy's fraudulent inducement claim on the grounds that the parol evidence rule barred evidence of any representations made before the execution of the contract, and it then concluded that the rule barred the parties from offering any evidence as to conversations that took place before the contract's execution to explain the meaning of the contract itself. In any event, Buddy's fails to cite to any case expressly holding that the parol evidence rule permits a party to pursue a fraudulent inducement cause of action simply because the prior representations were included in the written contract.[3]

CentiMark asserts that the jury's verdict violated a contractual cap on damages and disclaimer of consequential damages. According to the warranty:

> If CentiMark determines that the leaks in the roof are caused by defects in

---

[3] In its reply brief, Buddy's cites to a 1953 Pennsylvania Supreme Court opinion as well as a 1938 ruling by the Lycoming County Court of Common Pleas in support of its contention that, "[w]here the false representation made prior to the contract is included in the contract, the integration clause cannot bar a fraud in the inducement claim as the testimony of the representation made prior to the contract is admissible." (Buddy's Brief at 49 (citing Anderton v. Patterson, 96 A.2d 111 (Pa. 1953); Casselberry v. Stair, 34 Pa. D. & C. 72 (Pa. Ct. Com. Pl. 1939)). However, neither case addressed a claim of fraudulent inducement.

the materials or workmanship supplied by CentiMark, Purchaser's remedies and CentiMark's liability shall be limited to CentiMark's repair of the roof. The value of CentiMark's services performed under this Warranty shall not exceed the original cost of the roofing services to the Purchaser.

(A3386.) Under the plain language of the warranty, the limitation only applies if CentiMark itself "determines that the leaks in the roof are caused by defects in the materials or workmanship supplied by CentiMark." CentiMark, however, has denied that its materials or workmanship caused the leaks. The warranty likewise provided that "in no case shall CentiMark be liable for, any special, incidental or consequential damages" and that "[s]uch excluded damages include, but are not limited to, . . . the cost of repairing and/or replacing other property when the roof services do not perform as warranted." (Id.) Furthermore, CentiMark is not obligated "to repair the roof system or any part of the roof system" in the event of either "[d]amage to the roof because of failure of any material used as the base over which the roof is applied (unless provided by CentiMark) or damage to the roof because of any material, assemblies or components used in, adjacent to or in contact with the roof system which were not furnished by CentiMark" or "[d]amage to the roof resulting from tie-ins to other roof systems." (Id.) The damage to the existing roof panels caused by CentiMark's conduct constituted direct damages and were not disclaimed by the parties' contract. See, e.g., Todd Heller, Inc. v. UPS, 754 A2d 689, 700 n.3 (Pa. Super. Ct. 2000) ("Consequential damages are 'losses that do not flow directly and immediately from an injurious act, but that result indirectly from the act.'" (quoting Black's Law Dictionary 394 (7th ed.)). As Buddy's aptly puts it, "other property" would include, for example, "a piece of machinery damaged because of

8

CentiMark defective material or workmanship"—as opposed to the roof itself, i.e., "the property to be repaired." (Buddy's Reply Brief at 10-11.) Likewise, the damages were the result of CentiMark's application of the coating and subsequent installation of ungasketed fasteners (and not, for example, because "of failure of any material used as the base over which the roof is applied (unless provided by CentiMark)"). It also appears that the coating and fasteners did not constitute "tie-ins" under the contract (e.g., temporary water cut-offs).

Buddy's admits that CentiMark disclaimed all implied warranties, including the implied warranty of workmanlike performance. However, the warranty specifically stated that "CentiMark will repair any leaks resulting from defects in the materials or workmanship in the roof services (services) performed by CentiMark, to the building noted above, for the period of time, noted above, from the Warranty Date." (A3386.) Given this express language, the Magistrate Judge did not commit any reversible error by allowing Buddy's to pursue a cause of action for "a breach by CentiMark of its express warranty to repair leaks caused by defective materials or workmanship provided by CentiMark." (Buddy's Reply Brief at 14 (citing A1336, A2700-12).)

According to CentiMark, "Buddy's, as a mere tenant of the Building, does not have standing to sue CentiMark for damages representing replacement of the entire roof, it only has a right to enforce its Warranty rights." (CentiMark's Reply Brief at 6-7.) CentiMark argues that, while Buddy's has standing to bring "claims for warranty repairs and failure to perform services," claims for damages to real property can only be brought

9

by the property owner, i.e., Studer Rental.  (CentiMark's Brief at 39.)  Ed Studer (Buddy's chief executive officer and Studer Rental's vice president) explained that, "[p]ursuant to an understanding between Studer Rental and Buddy's, Buddy's has agreed to undertake to repair the buildings if any of them suffers damage from any source." (A951; see also, e.g., A2323 ("Buddy's has an agreement with Studer Rental to — they take care of all the buildings, all the upkeep.")).)  In fact, the written lease explicitly permitted Studer Rental to assign or transfer its rights and obligations.  Accordingly, Buddy's maintained insurance on the buildings (and the insurer subsequently paid the claim submitted by Buddy's for the hail damage).  Given the circumstances, we conclude that the Magistrate Judge properly disposed of CentiMark's standing challenge.

Under the warranty, "any action by purchaser, to enforce any claims against CentiMark, must be commenced within one (1) year from the date that a defect in materials or workmanship, or other breach or any other claim is discovered or reasonably should have been discovered."  (A3386 (emphasis omitted).)  The Magistrate Judge determined that, "if a jury finds that it was reasonable for Plaintiff to discover the breach of contract at a time before November 3, 2008 (one year prior to the action's commencement), the complaint is untimely and Defendant will be entitled to judgment as a matter of law."  Buddy's, 2013 WL 169697, at *9.  According to CentiMark, Buddy's was on notice of its claims when the roof first leaked in December 2005, and the jury's finding to the contrary was against the substantial weight of the evidence.  It even goes so far as to characterize this case as "a classic example of jury nullification."  (CentiMark's

10

Brief at 51.) Nevertheless, we agree with the Magistrate Judge that "there was substantial evidence for the jury to determine that Buddy's filed suit within the applicable limitations period." Buddy's, 2014 WL 1317578, at *4. Despite ongoing leaks and CentiMark's various attempts to fix the problem, CentiMark claimed that it was unable to determine the cause of the leaks and has never acknowledged that the leaks were caused by its own defective materials or workmanship. It was not until 2007 that CentiMark's employees drove ungasketed fasteners through the roof panels, which (according to Buddy's expert witnesses) caused so much damage to the panels that they had to be replaced (or, at least, required the installation of a "roof hugger system"). Buddy's also cooperated with an investigation conducted by a roofing consultant retained by CentiMark, who indicated in a November 2007 report that the leaks may have been caused by building condensation or the movement of the panels. "Additionally, there was evidence introduced that Buddy's expert Robert [Stanford] only reported to Buddy's that the leaking was caused by CentiMark's use of defective workmanship and/or materials in July 2009, five months before Buddy's filed suit." Id.

While CentiMark challenges the Magistrate Judge's refusal to instruct the jury that Buddy's had an affirmative duty to investigate its claims, we believe that the Magistrate Judge properly charged the jury as to the contractual limitations period. See, e.g., In re Merritt Logan, Inc., 901 F.2d 349, 359 (3d Cir. 1990) ("Once the district judge has charged the jury, '[o]ur function is to determine whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to

11

the jury.'" (quoting Ayoub v. Spencer, 550 F.2d 164, 167 (3d Cir. 1977))). The Magistrate Judge based his instructions on the language of the warranty itself (which did not expressly refer to any duty to conduct an investigation). For instance, he charged the jury that "[t]he phrase, reasonably should have been discovered, imposes a duty upon Buddy's to exercise only reasonable diligence to discover that it has been injured and by what cause," and that, "[u]nder the reasonable diligence test, you must evaluate Buddy's actions to determine whether it exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own." (A2706.)

CentiMark argues that the Magistrate Judge "improperly admitted prejudicial, inadmissible evidence." (CentiMark's Brief at 19.) We review evidentiary determinations for abuse of discretion. See, e.g., Forrest v. Beloit Corp., 424 F.3d 344, 349 (3d Cir. 2005).

Hartman, a roofing contractor, opined that it would cost approximately $1.8 million to replace the roof panels. According to CentiMark, Hartman's one-page estimate or report failed to meet the requirements of Federal Rule of Civil Procedure 26(a)(2)(B) and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), because it did not state, inter alia, the source of the quantities, measurements, and prices quoted in his report, the information he relied on in preparing the report, his qualifications, an explanation for why the materials he quoted were suitable for use, a list of publications or other cases where his testimony was offered (if any), the amount of his compensation, and

12

whether he was making his opinions to a reasonable degree of professional certainty.

CentiMark nevertheless acknowledges that "the [District] Court is granted leeway in the

imposition of sanctions" for violations of Rule 26(a)(2)(B) and (C) (CentiMark's Brief at

58) and that "the requirements of the Rule are liberally construed by the courts"

(CentiMark's Reply Brief at 19). It also admits that, given his trial testimony, "Mr.

Hartman might qualify as an expert roof replacement estimator under Daubert."

(CentiMark's Reply Brief at 20 (footnote omitted).) In fact, Hartman testified that he had

more than twenty years of experience working as a roofing contractor and that, in order to

calculate the cost of replacing the roof panels, he visited the site and took measurements.

CentiMark also deposed Hartman's after he submitted his report. Buddy's then relied on

the testimony of two other experts (Robert Stanford and Derek Hodgin) to establish that

the existing roof panels could not simply be repaired. Under the circumstances, the cost

of replacing the roof panels constituted an appropriate measure of damages. See, e.g.,

Buddy's, 2014 WL 1317578, at *18 ("Generally, '[c]ontract damages are ordinarily based

on the injured party's expectation interest and are intended to give him the benefit of his

bargain by awarding him a sum of money that will, to the extent possible, put him in as

good a position as he would have been in had the contract been performed.'" (quoting

Restatement (Second) of Contracts § 347 cmt. a (1981))).

CentiMark contends that Buddy's attempted to avoid the provision of its lease

providing that Studer Rental was responsible for maintaining the roof in good condition

by eliciting testimony from Studer about "some vague and undefined duty or agreement

13

[on the part of Buddy's] to repair damages to the Buildings." (CentiMark's Brief at 59 (footnote omitted) (citing A2323-24).) According to CentiMark, this testimony directly conflicted with the terms of the written lease and should not have been admitted. In turn, Buddy's purported failure to produce documentary proof of an amendment or assignment meant that testimony about the contents of this documentation constituted inadmissible hearsay. However, it appears undisputed that Buddy's did produce a copy of the insurance policy it had obtained for the property (as well as, inter alia, proof that the insurer paid the claim Buddy's submitted for the hail damage). It is also uncontested that a written contract generally may be modified by a subsequent oral agreement.[4] See, e.g., Knight v. Gulf Refining Co., 166 A. 880, 882 (Pa. 1933); Michael Salove Co. v. Enrico Partners, 23 A.3d 1066, 1070 (Pa. Super. Ct. 2011).

Finally, CentiMark challenges the admission of photographs and videos depicting the roof leaks (which were taken more than six years after CentiMark had initially applied the coating) on the grounds that such materials were irrelevant under Federal Rule of Evidence 401 and, even if relevant, any probative value was substantially outweighed by unfair prejudice pursuant to Federal Rule of Evidence 403. Claiming, inter alia, that the existence and severity of the leaks were never disputed, CentiMark asserts that "[t]here was no point to this evidence except to provoke an emotional reaction and encourage the

---

[4] In its reply brief, CentiMark contends that Studer's testimony violated the best evidence rule codified at Federal Rule of Evidence 1002. Because CentiMark raises this argument for the first time in its reply brief, we consider the contention to be waived. See, e.g., United States v. Cruz, 757 F.3d 372, 387 (3d Cir. 2014), cert. denied, 2015 WL 133477 (U.S. Jan. 12, 2015).

14

jurors to punish CentiMark with an exorbitant verdict."  (CentiMark's Reply Brief at 29.) However, as the Magistrate Judge pointed out, the roof was still covered by CentiMark's warranty at the time the photographs and videos were taken.  It also appears that this evidence helped to highlight the defective (and damaging) nature of both the coating as well as the ungasketed fasteners.  We additionally note that the Magistrate Judge specifically instructed the jury to "not let bias, sympathy or prejudice influence your decision in any way."  (A2688.)

III.

For the foregoing reasons, we will affirm the judgment of the Magistrate Judge as well as the orders entered by the Magistrate Judge on January 16, 2013, October 18, 2013, December 2, 2013, December 3, 2013, and March 31, 2014.